IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

SANDRA M. MASON,
        Plaintiff,

vs.                                          Case No.: 3:17cv417/MCR/EMT

NANCY A. BERRYHILL,
Acting Commissioner of Social Security,
        Defendant.
_____/

## REPORT AND RECOMMENDATION

This case has been referred to the undersigned magistrate judge pursuant to the authority of 28 U.S.C. § 636(b) and Local Rules 72.1(A), 72.2(D) and 72.3 of this court relating to review of administrative determinations under the Social Security Act ("Act") and related statutes, 42 U.S.C. § 401, *et seq*. It is now before the court pursuant to 42 U.S.C. § 405(g) of the Act for review of a final determination of the Commissioner of Social Security ("Commissioner") denying Plaintiff's application for disability insurance benefits ("DIB") under Title II of the Act, 42 U.S.C. §§ 401–34.

Upon review of the record before this court, it is the opinion of the undersigned that the findings of fact and determinations of the Commissioner are supported by substantial evidence; thus, the decision of the Commissioner should be affirmed.

## I.    PROCEDURAL HISTORY

On April 9, 2014, Plaintiff filed an application for DIB, and in the application she alleged disability beginning February 12, 2011 (Tr. 20).[1]  Her application was denied initially and on reconsideration, and thereafter Plaintiff requested a hearing before an administrative law judge ("ALJ").  A hearing was held on March 21, 2016, and on June 29, 2016, the ALJ issued a decision in which she found Plaintiff "not disabled," as defined under the Act, at any time through the date of her decision (Tr. 20–29).  On June 3, 2017, the Appeals Council denied Plaintiff's request for review (Tr. 1).  Thus, the decision of the ALJ stands as the final decision of the Commissioner, subject to review in this court.  Ingram v. Comm'r of Soc. Sec. Admin., 496 F.3d 1253, 1262 (11th Cir. 2007).  This appeal followed.

## II.   FINDINGS OF THE ALJ

On June 29, 2016, (date of ALJ decision), the ALJ made the following findings relative to the issues raised in this appeal (Tr. 20–29):

---

[1] All references to "Tr." refer to the transcript of Social Security Administration record filed on August 16, 2017 (ECF No. 5).  Moreover, the page numbers refer to those found on the lower right-hand corner of each page of the transcript, as opposed to those assigned by the court's electronic docketing system.

Case No.: 3:17cv417/MCR/EMT

1)    Plaintiff met the insured status requirements of the Act through December 31, 2016[2];

2)    Plaintiff had not engaged in substantial gainful activity since February 21, 2011, the alleged onset date;

3)    Plaintiff had the following severe impairments: right knee arthritis, diabetes mellitus with neuropathy, depression, and anxiety;

4)    Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1;

5)    Plaintiff had the residual functional capacity to perform sedentary work as defined in 20 C.F.R. § 404.1567(a) except Plaintiff could never climb a ladder, rope, or scaffold, or crawl. Plaintiff could frequently push and pull with her bilateral upper extremities. Plaintiff could frequently reach and handle with her bilateral upper extremities. Plaintiff could occasionally finger and feel with her bilateral upper extremities. Plaintiff could understand, remember, and carry out simple, repetitive instructions, as well as some detailed instructions. Plaintiff could interact appropriately with the general public, co-workers, and supervisors. Plaintiff could adapt to changes in the work setting;

6)    Plaintiff was capable of performing her past relevant work as a receptionist. This work did not require the performance of work-related activities precluded by Plaintiff's residual functional capacity;

7)    Plaintiff had not been under a disability, as defined in the Act, from February 21, 2011, through the date of the decision.

---

[2] Thus, the time frame relevant to this appeal is February 21, 2011 (alleged onset date) to June 29, 2016, date of ALJ's decision.

III.    STANDARD OF REVIEW

Review of the Commissioner's final decision is limited to determining whether the decision is supported by substantial evidence from the record and was a result of the application of proper legal standards.  Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991) ("[T]his Court may reverse the decision of the [Commissioner] only when convinced that it is not supported by substantial evidence or that proper legal standards were not applied."); see also Lewis v. Callahan, 125 F.3d 1436, 1439 (11th Cir. 1997); Walker v. Bowen, 826 F.2d 996, 999 (11th Cir. 1987).  "A determination that is supported by substantial evidence may be meaningless . . . if it is coupled with or derived from faulty legal principles." Boyd v. Heckler, 704 F.2d 1207, 1209 (11th Cir. 1983), superseded by statute on other grounds as stated in Elam v. R.R. Ret. Bd., 921 F.2d 1210, 1214 (11th Cir. 1991).  As long as proper legal standards were applied, the Commissioner's decision will not be disturbed if in light of the record as a whole the decision appears to be supported by substantial evidence. 42 U.S.C. § 405(g); Falge v. Apfel, 150 F.3d 1320, 1322 (11th Cir. 1998); Lewis, 125 F.3d at 1439; Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995).  Substantial evidence is more than a scintilla, but not a preponderance; it is "such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  Richardson

v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 842 (1971) (quoting

Consolidated Edison Co. v. NLRB, 305 U.S. 197, 59 S. Ct. 206, 217, 83 L. Ed. 126

(1938)); Lewis, 125 F.3d at 1439. The court may not decide the facts anew, reweigh

the  evidence, or substitute its judgment for that of the Commissioner.  Martin v.

Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990) (citations omitted).  Even if the

evidence preponderates against the Commissioner's decision, the decision must be

affirmed if supported by substantial evidence. Sewell v. Bowen, 792 F.2d 1065, 1067

(11th Cir. 1986).

The Act defines a disability as an "inability to engage in any substantial gainful

activity by reason of any medically determinable physical or mental impairment

which can be expected to result in death or which has lasted or can be expected to last

for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).  To

qualify as a disability the physical or mental impairment must be so severe that the

claimant is not only unable to do her previous work, "but cannot, considering [her]

age, education, and work experience, engage in any other kind of substantial gainful

work which exists in the national economy." *Id*. § 423(d)(2)(A).

Pursuant to 20 C.F.R. § 404.1520(a)–(g), the Commissioner analyzes a

disability claim in five steps:

1.     If the claimant is performing substantial gainful activity, she is not disabled.

2.     If the claimant is not performing substantial gainful activity, her impairments must be severe before she can be found disabled.

3.     If the claimant is not performing substantial gainful activity and she has severe impairments that have lasted or are expected to last for a continuous period of at least twelve months, and if her impairments meet or medically equal the criteria of any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, the claimant is presumed disabled without further inquiry.

4.     If the claimant's impairments do not prevent her from doing her past relevant work, she is not disabled.

5.     Even if the claimant's impairments prevent her from performing her past relevant work, if other work exists in significant numbers in the national economy that accommodates her residual functional capacity and vocational factors, she is not disabled.

The claimant bears the burden of establishing a severe impairment that keeps her from performing her past work. 20 C.F.R. § 404.1512. If the claimant establishes such an impairment, the burden shifts to the Commissioner at step five to show the existence of other jobs in the national economy which, given the claimant's

impairments, the claimant can perform. <u>MacGregor v. Bowen</u>, 786 F.2d 1050, 1052 (11th Cir. 1986). If the Commissioner carries this burden, the claimant must then prove she cannot perform the work suggested by the Commissioner. <u>Hale v. Bowen</u>, 831 F.2d 1007, 1011 (11th Cir. 1987).

## IV.    PLAINTIFF'S PERSONAL, EMPLOYMENT, AND MEDICAL HISTORY

### A.    Relevant Personal and Employment History

Plaintiff testified at her hearing held March 21, 2016, that she was employed as a receptionist, and then as the front office manager, at the office of Dr. Gary Gotthelf, Dr. Gotthelf also being a primary care physician for Plaintiff as it relates to these proceedings (Tr. 47–48, 50). Plaintiff was so employed until 2011 when she was terminated after she became afflicted with diabetes (Tr. 49). She stated that her diabetes caused her "a lot of low blood sugars. And it caused me to not be able to do my job to my best ability" (*id*.).

Plaintiff described the primary effect of the diabetes as occurring in her hands, where she suffers from a lack of manual dexterity, numbness and tingling, poor strength and grip, and tremors, which made it difficult for her to type and pick up objects (Tr. 49). As a result, her job performance dropped and she was let go from her job at Dr. Gotthelf's office (*id*.). Plaintiff stated that the symptoms of neuropathy in her hands only got worse thereafter (Tr. 50–51).

Plaintiff testified that she spends about 80 percent of the day sitting down with her feet elevated to keep them from swelling (Tr. 52).  She said she can only sit in the same position for 15 minutes at a time, stand for only 15 to 20 minutes at a time, and walk for only 30 minutes at a time (Tr. 54).  She stated she usually takes a two-hour nap every day, as a result of her blood sugar fluctuations as well as the medications she takes (Tr. 53).  Plaintiff also stated that she requires assistance from her daughter when washing her hair because of the difficulty she has lifting her arms (Tr. 54–55).  She indicated that she can grocery shop, but only for short trips (Tr. 55).

B.      Relevant Medical History[3]

Plaintiff was admitted into Sacred Heart Hospital on April 10, 2012, for nausea, a blood sugar reading of 379, headaches, lethargy, and an inability to focus (Tr. 276).  Plaintiff was found to be in a state of metabolic acidosis and hyperglycemia, prompted by the fact that Plaintiff ran out of her insulin and had not taken any for the past three days (Tr. 292).  During the visit, Plaintiff was reported to be comfortable, oriented, without pain, and with normal strength and sensation (Tr. 277–78).  A CT brain scan revealed no abnormalities other than sinus inflammation (Tr. 292).

---

[3] While Plaintiff occasionally references her mental health issues—depression and anxiety—her challenge to the ALJ's decision is based upon her physical impairments as related to her diabetes and neuropathy.  Thus, the court similarly may note Plaintiff's mental health issues as is relevant but generally confines its factual review and analysis to Plaintiff's physical impairments.
Case No.: 3:17cv417/MCR/EMT

Plaintiff was released on the following day with a diagnosis of diabetic ketoacidosis that was resolved in the hospital after insulin and other medications were administered (*id*.).

Plaintiff then followed up with Dr. Vishnu Behari, an endocrinologist, on May 1, 2012.  Dr. Behari diagnosed Plaintiff with "[diabetes mellitus] with neurological manifestations, type 1, uncontrolled," as well as peripheral autonomic neuropathy (Tr. 368).  He noted that Plaintiff "was previously undiagnosed Type 1 diabetes and always thought that she was an insulin requiring Type 2 diabetic" (Tr. 367).  Dr. Behari noted that Plaintiff was feeling better once she became more compliant with her insulin, and he gave her instruction on better managing her condition (Tr. 367).  During the visit, Plaintiff was noted to be without headaches or dizziness and with normal sensation (Tr. 367–68).  Plaintiff also reported she was exercising regularly (Tr. 367).

On June 11 and 13, 2012, Plaintiff was seen at the office of her primary care physician, Dr. Gotthelf, M.D., for a toe injury.  During the visits, the Physician Assistant, Stephen Bast, found that Plaintiff's blood sugars were not under control (Tr. 417, 422).  However, Plaintiff was reported to have no headaches, dizziness, or motor or sensory disturbance (Tr. 418–19).  At a third office visit on June 19, 2012, Plaintiff's blood sugar was noted to be "so much better," having responded favorably

to a new insulin regimen that included "mandatory 12 units of Novolog + sliding scale for meals and Levemir increases" (Tr. 427).

During a regular check-up on October 2, 2012, however, Plaintiff's blood sugar was reported to be varying significantly (Tr. 432). Again, no malaise or headaches were evident, nor any neurological or musculoskeletal difficulties (Tr. 433–34). The physician assistant stated he had "not much trust with consistent insulin levels" with the Levemir Plaintiff was taking, and with Plaintiff's agreement he suggested that her medication be changed to Lantus for a couple of weeks to see if it would provide better control of her sugars (Tr. 432).

On October 29, 2012, Plaintiff returned to Dr. Behari who noted that she was not doing well, that she was out of her Novolog, and that she had brought applications for patient assistance with her (Tr. 363). Dr. Behari noted that while Plaintiff had done better for a while, she had not been compliant with her diet and regular exercise (*id*.). Nonetheless, Plaintiff was reported as without dizziness, headaches, or any other neurological or musculoskeletal disturbances (Tr. 364). Dr. Behari gave Plaintiff samples of Levemir and Novolog to keep her supplied "until her patient assistance gets there" (Tr. 363). Plaintiff reported that she was feeling unwell and planned to apply for disability (*id*.).

Plaintiff next received care through Dr. Gotthelf's office on January 4, 2013, for a tick bite; her diabetes was reported as stable (Tr. 438).  On March 12, 2013, Plaintiff returned to Dr. Gotthelf's office complaining of pain from her right shoulder down to her wrist and numbness from her right wrist down to her fingers (Tr. 440). She was determined to have weakness in her right hand with diminished grip strength, and decreased sensation along with a resting tremor in her right hand and wrist (Tr. 443).  Plaintiff reported that her blood glucose levels were usually around 100 in the morning and between 180–230 prior to meals, but that the day before it was 50 during the morning and 284 at night (Tr. 440).  Her assessment was either mononeritis or that she had had an ischemic event (Tr. 443).  Plaintiff was then referred for an MRI on March 13, 2013, the results of which ruled out an ischemic event (Tr. 354).

Plaintiff sought care from a neurologist, Dr. Roman Kesler, on April 2, 2013. Plaintiff reported that her right arm and hand symptoms from the month prior had improved such that she could use them much more (Tr. 338).  Plaintiff presented with symptoms of fatigue, insomnia, numbness, vertigo, and occasional right hand tremor (Tr. 339).  Dr. Kesler's assessment was right radial mononeuropathy which was improving, and possible superimposed carpal tunnel syndrome or diabetic related neuropathy (Tr. 340).  Dr. Kesler ordered a Nerve Conduction Study ("NCS") and Electromyograph ("EMG"), the results of which indicated moderate right radial

mononeuropathy at the spiral groove, and it was noted that a "lack of active denervation and presence of reinnervation suggest a relatively good prognosis for further symptom improvement" (Tr. 336).

On October 7, 2013, Plaintiff returned to Dr. Gotthelf's office, stating that she had been using her insulin more regularly and that the neuropathy in her arms had improved to the point that it was no longer waking her up at night (Tr. 452). Plaintiff reported that she had not seen Dr. Behari in the last ten months, stating that the appointment was too expensive (*id*.). Plaintiff was seen by Dr. Gotthelf on December 16, 2013, because of pain while swallowing, numbness in her face, blurry vision, and a swollen tongue, during which time her sugars were noted to be "sky high" (Tr. 462). Plaintiff was thereby reported to have sensory disturbances but no dizziness or motor disturbances (Tr. 464). However, Dr. Gotthelf's physical findings were that Plaintiff had "no sensory exam abnormalities" (Tr. 465).

Plaintiff saw Dr. Behari on March 14, 2014, for follow up on her diabetes treatment. Dr. Behari noted that Plaintiff had not seen him in two years (Tr. 359). He also noted Plaintiff's "history of non-compliance" with her diabetes treatment regimen. Plaintiff did not bring her glucometer with her to the appointment because hers was broken and she had been sharing her cousin's glucometer. Dr. Behari provided her with a new glucometer so that she could resume keeping track of her

blood-sugar levels.  Plaintiff reported that her blood sugars had been "all over the place," but because she could provide no readings of her blood sugars, Dr. Behari could not make any accurate adjustments (*id*.).  Nonetheless, Plaintiff reported no fatigue, range of motion limitations, muscle or joint pain, memory limitations, dizziness, or weakness (Tr. 360).  Still without a job, Plaintiff reported that she had no insurance and therefore needed Dr. Behari to fill out her patient assistance forms so that she could get her insulin (Tr. 359).  Plaintiff was advised to use the new glucometer for the next two weeks and then bring it to the office for a "download" so that Dr. Behari could make any necessary changes to her "sliding scale" (*id*.).  Dr. Behari reminded Plaintiff to schedule an appointment for her annual diabetic eye exam *id*.).

Plaintiff was seen again by Dr. Gotthelf on April 1, 2014, during which her blood was tested and revealed a blood glucose level of 111 milligrams per deciliter (111 mg/dL), above the normal range of 65 to 99 mg/dL (Tr. 468, 394).[4]

---

[4]  Plaintiff's counsel notes that her blood glucose level of 111 milligrams per deciliter was substantially lower than her previous reading of 525 mg/dL, taken approximately six months earlier (Tr. 390).  Counsel also points out, however, that Plaintiff's hemoglobin A1c count had risen during those six months, from 10.7% to 11.0%, on a scale where less than 5.7% was consistent with the absence of diabetes and greater than 6.5% is consistent with the presence of diabetes (ECF No. 7 at 13 n.1; Tr. 394).

Plaintiff visited Dr. Gotthelf's office on June 18, 2014.  Though Plaintiff reported that she had been compliant with her insulin regimen, a urinalysis completed that day indicated that her glucose level was above 500 (Tr. 470, 474).

Plaintiff returned to her neurologist Dr. Kesler on October 7, 2014.  Dr. Kesler noted Plaintiff's symptoms of pain and numbness in her arms, legs, and feet for the past year (Tr. 504).  Plaintiff also reported a tremor in her right hand that occasionally interfered with activity (*id*.).  Dr. Kesler indicated that Plaintiff had not seen her in a while because of "high deductibles" (*id*.).  Dr. Kesler also noted: "[Deep tendon reflexes] normal in bilateral upper and lower extremities.  Sensory exam is mildly diminished diffusely in [bilateral] arms.  Coordination/cerebellar functions grossly normal without ataxia or dysmetria of the upper or lower extremities" (Tr. 506).

Dr. Kesler contemporaneously performed an upper and lower NCS/EMG (Tr. 506), the results of which were essentially normal (Tr. 513).  He particularly noted that Plaintiff "developed a right arm tremor during EMG; however, this ceased during distraction of serial 7 subtraction from 100" (*id*.).  On a follow-up visit on November 18, 2014, Dr. Kesler added Neurontin, a nerve pain medication, to her prescription regimen to address the continued pain in Plaintiff's limbs (Tr. 503).

Dr. Kesler also referred Plaintiff to a rheumatologist, and Plaintiff was seen by Donna Judson, M.D., on November 20, 2014.  Plaintiff complained of pain in her

hands but related that, according to Dr. Kesler, this was attributable to arthritis, not neuropathy (Tr. 483). Plaintiff reported that her glucose levels had varied greatly and had not been well controlled historically (*id*.). Dr. Judson's opinion was that Plaintiff was "on way too many medications" (*id*.).

On December 18, 2014, Dr. Judson saw Plaintiff to review the results of the "IPRO" glucose tracking unit she had implemented (Tr. 480). The results showed that Plaintiff's blood sugar levels were quite variable, either very high or very low (*id*.). Plaintiff also reported diarrhea; Dr. Judson made adjustments in her medication and reiterated her opinion that Plaintiff should be on less medication (*id*.).

Dr. Kesler noted that Plaintiff missed a scheduled appointment on with him on January 19, 2015; the reason provided was that Plaintiff's insurance had been terminated (Tr. 542). On March 4, 2015, Plaintiff placed a telephone call to the office in order to get a refill of her prescription of the painkiller Tramadol (Tr. 541), which her primary care physician would not prescribe to her over the telephone (*id*.). Dr. Kesler similarly declined to fill the prescription, stating that she would need an appointment in order for the painkiller to be prescribed (*id*.).

Plaintiff visited the Escambia Community Clinic on March 20, 2015, to establish a new primary care provider and was seen by Juanita Fleming, M.D. (Tr. 496). At the appointment, her A1c was measured at 9.8%, and her glucose level was

measured at 142 mg/dL (Tr. 498). Plaintiff was restarted on her Tramadol painkiller on an as needed basis (Tr. 493). On April 14, 2015, Plaintiff returned for a follow-up visit with Dr. Fleming, during which her glucose level was measured at 90mg/dL (Tr. 495). Plaintiff was again seen by Dr. Fleming on June 22, 2015. Although she reported that she had improved from a previous infection, she stated that "she had an episode of passing out" since her last appointment (Tr. 489). Plaintiff related that her glucose "machine" had broken, and she was uncertain as to whether it was providing accurate readings (*id.*). She also stated that the numbness and tremors in her hand were worse, particularly in the fourth and fifth digits (*id.*). Plaintiff was tested to have an A1c level of 9.6% and a glucose level of 333 mg/dL (Tr. 492). Dr. Fleming encouraged her "compliance with insulin and diabetic meal plan" (Tr. 489).

On September 8, 2015, an ambulance was summoned to Plaintiff's residence because she was having "diabetic problems" (Tr. 577). Plaintiff's chief complaint was identified as having a low glucose level, which was measured at 32 mg/dL (Tr. 567). Plaintiff's daughter explained that Plaintiff was refusing to drink juice in order to raise her glucose levels (Tr. 574). Plaintiff was loaded into the ambulance and administered a dextrose solution (D10), whereby she became more alert and subsequently refused transport to a hospital (*id.*). Upon re-test, Plaintiff was found to be at 119 mg/dL and considered stabilized (Tr. 567, 574).

On December 23, 2015, Plaintiff returned to see Dr. Fleming.  At the appointment, her glucose levels was measured at 184 mg/dL, and her A1c was at 11.3% (Tr. 562).  Plaintiff complained of right knee pain and noted that her glucose levels remained high (Tr. 552).

On June 19, 2014, Dr. Gotthelf completed a Supplemental Questionnaire as to Residual Functional Capacity as it pertained to Plaintiff's psychiatric symptoms (Tr. 476–77).  Dr. Gotthelf opined that Plaintiff would often have limitations in concentration, persistence, and pace that would frequently result in a failure to complete tasks in a timely manner in a work setting or elsewhere (Tr. 476).  He found her difficulty in maintaining social functioning and her episodes of deterioration or decompensation to be moderate, however (*id.*).  He also found her ability to carry out and remember instructions, to respond appropriately to supervision and co-workers, and to perform simple or repetitive tasks to be slight (Tr. 476–77).   In making the above findings, Dr. Gotthelf acknowledged on the form that a psychological evaluation had not been obtained (Tr. 477).

On an Assessment of Physical Residual Functional Capacity form, Dr. Gotthelf stated that Plaintiff could walk or stand less than one hour and could sit for over six hours if her feet were supported (Tr. 478).  He provided that Plaintiff could frequently lift less than five pounds, could occasionally lift between five to ten pounds, and

could never lift more than that (*id*.).  He stated that Plaintiff was not restricted from bending and was not limited in fine/gross manipulation, but that she would be restricted from climbing stairs and ladders (*id*.).  Dr. Gotthelf opined that Plaintiff would require a thirty-minute rest period for every two hours (Tr. 479).  On both the physical and psychiatric evaluation forms, Dr. Gotthelf estimated that, due to Plaintiff's impairments or treatment, she would be absent from work for four or more days per month, and he concluded that would she be disabled from full-time continuous employment for at least twelve months (Tr. 477, 479).

In July of 2014, Mike Dow, Ph.D., conducted a case analysis and noted his evaluations on a  form, finding that Plaintiff had mild restrictions in activities of daily living and in social functioning, and moderate difficulties in concentration, persistence, or pace (Tr. 83).  Edmund Molis, M.D., rated Plaintiff's limitations on a form, finding that she could frequently lift and carry twenty-five pounds, occasionally lift and carry fifty pounds, and stand or walk with normal breaks for six hours during an eight-hour work day (Tr. 86).  Robert Schilling, Ph.D., P.A., also performed a case analysis and determined that Plaintiff had mild restrictions in social functioning and daily living activities and had moderate difficulties in concentration, persistence, or pace (Tr. 67).

In January of 2013, Lynn Lightfoot, Ph.D., performed a consultative examination focused on Plaintiff's mental health, and she indicated that, in conjunction with Plaintiff's medical problems, her prognosis was "guarded" (Tr. 331).

In April of 2014, Ms. Tammy Beck, Plaintiff's cousin and roommate, completed a Supplemental Third Party Pain Questionnaire and a Supplemental Third Party Anxiety Questionnaire on Plaintiff's behalf. She indicated that Plaintiff often stayed off her feet and elevated them when they were hurting or swollen; that she did not do much cooking anymore; and that Plaintiff's limited use of her hands and feet made housekeeping difficult (Tr. 190). Ms. Beck also provided that Plaintiff enlisted others to pick things up from the store for her and that she was often unable to sleep due to pain or glucose level issues (*id*.). She also stated that Plaintiff was unable to do home maintenance jobs or yardwork and was very limited in her social activities or hobbies (Tr. 190–91). She indicated that Plaintiff cannot stand or walk for long periods of time (Tr. 191). Ms. Beck further noted that, "[d]ue to diabetic neuropathy or another neurological condition Plaintiff has severe tremors in her arms. She is also a very brittle diabetic, one moment her sugar may be extremely high and the next she may have very very low sugar" (Tr. 194). She further stated that these tremors prevent Plaintiff from doing anything that requires physical exertion, although she

could prepare herself light breakfasts and straighten her house, do laundry, do light

cleaning, vacuum, sweep, and put dishes in the dishwasher (Tr. 195–96). She stated

that when Plaintiff's sugar levels are low she gets migraine headaches which "affect

her ability to do anything" (Tr. 195).

## V.    DISCUSSION

Plaintiff first contends that the ALJ erred by not providing good cause in

discounting the opinion of her treating physician, Dr. Gotthelf.[5]  Substantial weight

must be given to the opinion, diagnosis and medical evidence of a treating physician

unless there is good cause to do otherwise. *See* Lewis v. Callahan, 125 F.3d 1436,

1439–41 (11th Cir. 1997); Edwards v. Sullivan, 937 F.2d 580, 583 (11th Cir. 1991);

Sabo v. Comm'r of Soc. Sec., 955 F. Supp. 1456, 1462 (M.D. Fla. 1996); 20 C.F.R.

§ 404.1527(c). "'[G]ood cause exists when the: (1) treating physician's opinion was

not bolstered by the evidence; (2) evidence supported a contrary finding; or (3)

treating physician's opinion was conclusory or inconsistent with the doctor's own

---

[5]  Defendant questions the legitimacy of Dr. Gotthelf's status as a treating physician for Plaintiff, stating that there is no evidence of this in the medical record. The court finds at least two instances in the medical record in which Dr. Gotthelf personally saw Plaintiff (Tr. 462, 468). Additionally, while it is true that in numerous instances where Plaintiff visited Dr. Gotthelf's office she was seen by a physician's assistant, it may be fair to assume that those assistants were under the supervision of Dr. Gotthelf. Also, as Defendant acknowledges, the ALJ referred to Dr. Gotthelf as a primary physician, but additionally Plaintiff herself stated of Dr. Gotthelf that "he's always been my doctor" (Tr. 50). Accordingly, the court considers Dr. Gotthelf as Plaintiff's primary treating source for purposes of this Report.

medical records." Phillips v. Barnhart, 357 F.3d 1232, 1240–41 (11th Cir. 2004) (citation omitted). The ALJ may discount a treating physician's opinion or report regarding an inability to work if it is unsupported by objective medical evidence or is wholly conclusory. *See* Edwards, 937 F.2d 580 (finding that the ALJ properly discounted treating physician's report where the physician was unsure of the accuracy of his findings and statements).

However, if a treating physician's opinion on the nature and severity of a claimant's impairments is well supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight. 20 C.F.R. § 404.1527(c)(2). The ALJ is required to review medical findings and other evidence in the record that support a medical source's statement that a claimant is disabled. However, the ALJ is responsible for making the ultimate determination about whether a claimant meets the statutory definition of disability. 20 C.F.R. § 404.1527(d). The ALJ is not required to give any special significance to the status of a physician as treating or non-treating in weighing an opinion on whether Plaintiff meets a listed impairment, a claimant's RFC (*see* 20 C.F.R. §§ 404.1545 and 404.1546), or the application of vocational factors, because those ultimate determinations are the province of the Commissioner. 20 C.F.R. § 404.1527(d).

Plaintiff's argument is unavailing in light of the above maxim, that the ultimate determination of disability is not the province of a treating physician but is a matter for the ALJ. In fact, it is noteworthy that, in finding that Dr. Gotthelf's opinions were entitled to partial weight, the ALJ specifically criticized only Dr. Gotthelf's ultimate conclusion that Plaintiff was disabled (Tr. 27). The ALJ otherwise noted that Dr. Gotthelf's findings as to Plaintiff's various physical capacities aligned with what the ALJ ultimately concluded, that Plaintiff could perform a reduced range of sedentary work (Tr. 27, 476–79). Thus, the ALJ gave less than full weight to Dr. Gotthelf's opinion only to the extent that Dr. Gotthelf made a finding that was not Dr. Gotthelf's to make.

Still, Dr. Gotthelf's opinion as to disability may not be ignored, and the ALJ surveyed the record and made the following findings:

> The claimant has a history of right knee arthritis and diabetes mellitus with neuropathy. An MRI of the brain returned unremarkable. (Tr. 354). An EMG showed a lack of active denervation and the presence of reinnervation that suggested a relatively good prognosis for further symptom improvement. (Tr. 516). Diagnostic testing showed that there was a normal right upper and lower extremity. (Tr. 513, 538). Treatment for the claimant's impairments included medications such as Levemir, which alleviated some of the claimant's symptoms. (Tr. 363). In fact, physical examination throughout the record generally showed benign findings including no reports of pain and normal range of motion, suggesting that treatment was at least somewhat effective. (Tr. 368–69). At times, pain, elevated blood glucoses, diminished pinprick and positive Tinel's were noted on some examinations, but these abnormal

clinical presentations were offset by generally benign presentations noted elsewhere in the record and by evidence of effective treatment. (Tr. 294–96; 340; 355; 359; 367; 397–401; *see also* 485; 489–97; 548–49). The record also provides evidence of medical noncompliance, which undermines the claimant's allegations of complete disability. (Tr. 398; 530). The claimant's right knee arthritis and diabetes with neuropathy is severe insofar that they require that she is limited to the sedentary exertional level with additional postural and manipulative limitations; however, the medical evidence of record does not support further limitation.

(Tr. 25–26) (record citations converted to the court transcript pagination).

The court finds that substantial evidence cited by the ALJ supports her evaluation of Plaintiff's RFC and that, in light of those findings, the ALJ's discounting of Dr. Gotthelf's opinion as to disability is not conclusory as argued by Plaintiff but is supported by substantial evidence as well.

Plaintiff criticizes the ALJ's use of a "string cite" in the ALJ's review of the record excerpted above.[6]  Although an ALJ should be careful with the use of string citation, this is not a case where such use resulted in overt vagueness or lack of clarity.  The lone case cited by Plaintiff, <u>Davis v. Colvin</u>, 2016 WL 3211770 (M.D. Ga. May 17, 2016), does little to support her argument.  As Plaintiff's block quotation

---

[6]  Plaintiff actually raises this "string cite" argument as part of her claim that the ALJ improperly discounted Plaintiff's testimony regarding her impairments, which is discussed *infra*. However, because of the tenor of Plaintiff's arguments in the instant "treating physican" claim, the court finds it prudent to include the argument here, and the court's evaluation of the argument should be considered to pertain to both claims.

from that case provides (*see* ECF No. 7 at 36), the ALJ had simply "string-cited [the treating physician's] entire treatment record" in rejecting the physician's opinion.  *Id.* at 7.   Moreover—and this is part of the <u>Davis</u> opinion that Plaintiff leaves out of her block quote—the court stated: "The ALJ set up a straw man, only to reject it for not containing 'exam findings, signs, and symptoms.'  Those 'exam findings, signs, and symptoms,' however, were contained throughout [the treating physician's] treatment notes and were the impairments which resulted in his opinion."  *Id.*   In other words, not only did the ALJ in <u>Davis</u> broadly cite to an entire medical record, he also apparently ignored substantial record evidence, perhaps in an effort to escape reviewing evidence which might have led to a contrary finding.

By contrast, the ALJ in the present case cited to specific pages or brief spans of pages.   Moreover, those citations to the record, as well as other citations throughout the passage quoted above, show instances in which Plaintiff's symptoms were generally benign, where her treatment was noted to be effective despite the need for adjustments to her medication and the like, where medical difficulties were often the result of Plaintiff's failure to take her medication, and where she was generally noted to have normal physiological functioning despite her impairments.

As importantly, Plaintiff does little to identify evidence in the medical record that should have changed the outcome of the ALJ's determinations.  In the main,

Plaintiff cites to Plaintiff's numerical readings related to her diabetes, specifically her high or fluctuating blood glucose and A1c levels. However, Plaintiff's diagnoses alone, or the medical terms or quantifiers used to measure them, are themselves insufficient to establish a disability. The severity of an impairment "must be measured in terms of its effect upon ability to work, and not simply in terms of deviation from purely medical standards of bodily perfection or normality." McCruter v. Bowen, 791 F.2d 1544, 1547 (11th Cir. 1986); *see also* Russell v. Astrue, 331 F. App'x 678, 681 (11th Cir. 2009) (rejecting claim where plaintiff asserted that her high blood pressure caused her to be disabled but failed to point to any documentation in her medical records demonstrating how it might so cause disability); Moore v. Barnhart, 405 F.3d 1208, 1213 n.6 (11th Cir. 2005).[7]

As the ALJ pointed out, not only were Plaintiff's symptoms during the period of disability generally reported as mild or brought under relative control when her medications were consistently taken, but despite her impairments, examinations

---

[7] Thus, as earlier referenced, Plaintiff makes the point that, while Plaintiff's blood glucose level was noted to have significantly improved during one visit in April of 2014, her A1c count had become worse during that same period. *See supra*, n.4. Plaintiff uses this to emphasize the point that an ALJ should be wary of using medical information to "usurp[] the role of a medical expert" (ECF No. 7 at 13 n.1). Yet it is arguable that Plaintiff makes that very mistake herself, by suggesting, without any sort of medical foundation, that the metrics mentioned in the footnote are in fact a counterexample to what the ALJ was trying to establish. This only serves to underscore the overarching point that it is not the condition or its diagnosis that establishes disability but rather how it demonstrably impairs the individual.

showed she was generally physically capable, neurologically sound, and with normal range of motion without pain. Ultimately, the ALJ accommodated her diabetes by limiting her to the sedentary exertional level with additional limitations, and Plaintiff does not bring forth sufficient evidence to challenge the substantial basis supporting that conclusion.

Next, Plaintiff claims that the ALJ failed to provide adequate and explicit reasons for discounting Plaintiff's testimony regarding the symptoms of her impairments.[8] To establish disability based on testimony concerning pain or other subjective symptoms, a "pain standard" must be satisfied. Wilson v. Barnhart, 284 F.3d 1219, 1225 (11th Cir. 2002). That is, a claimant must first show evidence of an underlying medical condition and then either (a) objective medical evidence that confirms the severity of the alleged pain stemming from that condition, or (b) that the objectively determined medical condition is so severe that it can reasonably be expected to cause the alleged pain. *Id.*; *see also* Holt v. Sullivan, 921 F.2d 1221, 1223 (11th Cir. 1991) (stating that this "standard also applies to complaints of subjective conditions other than pain").

---

[8] The ALJ found that Plaintiff's impairments could reasonably be expected to cause her alleged symptoms but that the intensity, persistence, and limiting effects of those symptoms were found to be inconsistent with the objective evidence in the record (Tr. 27).

When medical signs and laboratory findings establish that a claimant has a medically determinable impairment that could reasonably be expected to produce the claimant's symptoms, the ALJ must evaluate the intensity and persistence of the claimant's symptoms and the extent to which those symptoms limit the claimant's capacity for work. 20 C.F.R. § 416.929(c)(1); Social Security Ruling ("SSR") 96–7p, 1996 WL 374186, at *2 (S.S.A. July 2, 1996). In so doing, the ALJ is to consider the objective medical evidence and other evidence provided by the claimant and her treating and non-treating sources concerning what may precipitate or aggravate her symptoms; what medications, treatment or methods are used to alleviate the symptoms; and how the symptoms affect the claimant's daily living. 20 C.F.R. § 416.929(c)(3). The ALJ's credibility finding must be grounded in the evidence and contain specific reasons that are supported by the record evidence. SSR 96–7p at 4; Hale, 831 F.2d at 1011. "If a claimant testifies as to his subjective complaints of disabling pain and other symptoms . . . , the ALJ must clearly 'articulate explicit and adequate reasons' for discrediting the claimant's allegations of completely disabling symptoms." Dyer v. Barnhart, 395 F.3d 1206, 1210 (11th Cir. 2005). *See also* Tieniber v. Heckler, 720 F.2d 1251, 1255 (11th Cir. 1983) (per curiam).

Plaintiff asserts that, other than the ALJ's string citation, there is no express rationale for her finding against Plaintiff's credibility.  As earlier discussed, the court does not find the ALJ's use of the string cite to be unduly vague or broad. Additionally, the ALJ pointed to other aspects of the record as other evidence that Plaintiff's credibility should be diminished.   These include observations that diagnostic testing generally produced unremarkable results and that physical examinations often noted no pain or other symptoms.  While the ALJ acknowledged there were episodes in which Plaintiff had elevated glucose levels and associated symptoms, she found that, not only were these episodes offset by generally benign presentations noted elsewhere in the record, but that the episodes were often a product of Plaintiff's own failure to take her medications consistently (Tr. 25–26).

Plaintiff challenges this last point, asserting that Plaintiff's noncompliance with her prescribed medication cannot be the basis for discrediting her testimony when that noncompliance was the result of her inability to afford the medication.  *See* Ellison v. Barnhart, 355 F.3d 1272, 1275 (11th Cir. 2003).  As Defendant points out, however, the ALJ is required to investigate into whether the claimant was unable to afford her medication only when the ALJ relies on noncompliance as the sole ground for the denial of disability.  *See* Ellison, 355 F.3d at 1275.  As seen above, Plaintiff's noncompliance is not the only evidence cited by the ALJ in her analysis.  Moreover,

aside from the ALJ's particular duty in this instance, the court notes that while Plaintiff episodically reported that she was not taking her medication and sometimes suggested that she could not afford it, she was nonetheless able to obtain insulin by submitting patient assistance forms, and she was given a glucometer to help her monitor her blood glucose levels.  Thus, even aside from Plaintiff's financial status, she was able to obtain her medication more readily than her own track record would suggest.

For the foregoing reasons, the Commissioner's decision is supported by substantial evidence and should not be disturbed.  42 U.S.C. § 405(g); Lewis, 125 F. 3d at 1439; Foote, 67 F.3d at1560.  Furthermore, Plaintiff has failed to show that the ALJ applied improper legal standards, erred in making her findings, or that any other ground for reversal exists.

Accordingly, it is respectfully **RECOMMENDED**:

1.    That the decision of the Commissioner be **AFFIRMED**, and that this action be **DISMISSED**.

2.    That **JUDGMENT** be entered, pursuant to sentence four of 42 U.S.C. § 405(g), **AFFIRMING** the decision of the Commissioner.

3.    That the Clerk be directed to close the file.

At Pensacola, Florida, this 13<u>th</u> day of August 2018.


/s/ *Elizabeth M. Timothy*
**ELIZABETH M. TIMOTHY**
**CHIEF UNITED STATES MAGISTRATE JUDGE**


## <u>NOTICE TO THE PARTIES</u>

**Objections to these proposed findings and recommendations must be filed within fourteen (14) days after being served a copy thereof.  <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.</u>  A copy of objections shall be served upon all other parties.  If a party fails to object to the magistrate judge's findings or recommendations as to any particular claim or issue contained in a report and recommendation, that party waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions. *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.**